UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSET

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.          ) | C.R. No. 03-30008-MAP |
| ) | C.R. No. 04-30026-MAP |
| CHARLES WINSTON, JR.    ) | |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
(Docket No. 499)[1]

January 28, 2005

PONSOR, D.J.

I. INTRODUCTION.

On October 15, 2003 at 110 Carr Street in Springfield, Massachusetts, federal and state law enforcement agents arrested the defendant Charles Winston, Jr., following the return of an indictment charging him and more than two dozen others with participating in a conspiracy to distribute controlled substances. During the course of the arrest, agents observed a quantity of cash in a night stand drawer

---

[1] Defendant Winston's Motion to Suppress, along with the government's opposition and supplemental opposition, has been filed in 03-CR-30008-MAP. The motion, however, appears to apply more properly to 04-CR-30026-MAP, since it pertains to evidence seized following the return of the earlier indictment and seeks to exclude evidence that appears to be relevant only to the later indictment.

located in the bedroom used by the defendant, as well as a safe in the basement of the residence. These two observations then formed the basis for a search warrant that was executed later that day and that resulted in the seizure of a scale with cocaine residue, a firearm and a large quantity of cash.

The defendant has moved to suppress the physical objects seized as a result of the execution of the search warrant, on the ground that the observations by the agents during defendant's arrest were made in violation of the Fourth Amendment. Because the court finds that these observations exceeded the permissible boundaries established by the Fourth Amendment, and that the items seized pursuant to the search warrant were the fruit of this violation, the Motion to Suppress will be allowed.

In addition, the court will suppress a statement made by the defendant on the ground that it also derived from the constitutional violation. In light of the unavailability of the evidence obtained as a result of the search warrant, the court will order the government to submit a notification within thirty days with regard to its intent to go forward on 04-CR-30026-MAP.

## II. FACTUAL BACKGROUND.

The defendant Charles Winston was indicted on October 14, 2003 as part of a second superceding indictment charging him, along with many others, with conspiracy to possess with the intent to distribute and possession with intent to distribute various controlled substances. On the same day he was indicted, a warrant was issued for his arrest.

The next day, October 15, 2003, a team of law enforcement agents went to the address where Winston was thought to be living, 110 Carr Street in Springfield, Massachusetts. Upon arrival at roughly 10:15 a.m., the agents recognized the defendant's distinctively painted blue BMW parked in front of the residence. Surveillance followed for a substantial period, during which time the agents hoped that the defendant would leave the residence and depart in his vehicle, giving them an opportunity to apprehend him in relative safety.

After the defendant failed to appear, a group of agents was detailed to go to the back of the house to cut off any escape, while others approached and knocked on the front door. The supervising officer during the arrest was DEA Agent Donald Wales. He had had glimpses of the defendant on prior

occasions and knew generally what he looked like. One of the officers covering the back of the residence was Patrick Burns, an ATF agent, who knew both the defendant and his girlfriend well, since he had seen the two of them during an earlier arrest of the defendant.

The residence at 110 Carr Street was a duplex, with Unit 110A on the right and 110B on the left. Agent Wales approached Unit 110A and knocked on the door. When Elizabeth Ortiz answered, he asked her whether she knew who drove the BMW parked in front of the residence. Ms. Ortiz denied any knowledge of who drove the BMW but suggested that the agents might want to check with the resident of Unit 110B. She then closed the door, and the agents moved to the lefthand side of the duplex. They knocked on the door of 110B and waited four or five minutes but received no response.

Agent Wales then knocked on the door of 110A again. About this time, Agent Burns, concerned about the delay, came around to the front of the house and arrived just as Elizabeth Ortiz was once more opening the door. Burns immediately recognized Ortiz as Winston's girlfriend and confronted her with this knowledge. Ortiz stammered and became visibly

anxious, at which point Wales drew the conclusion (correct, as it turned out) that she had been misleading the agents about the defendant's presence. The officers pushed past her into the house to effectuate the arrest warrant.

State Trooper Martin, a task force agent assisting in the arrest, immediately moved off to the right, and proceeded through the living room and the kitchen towards the basement. Agent Wales started up the stairs, which were directly in front of the door, calling out "Chuck?" to which a voice from upstairs answered, "Up here."

Agent Wales proceeded cautiously up the stairs with his gun drawn and saw the defendant Winston on the landing holding a cell phone. In response to the agent's instruction, the defendant immediately dropped the cell phone, placed his hands against the wall, and was handcuffed.

Agent Burns, waiting at the bottom of the stairs, noticed a toddler approximately fourteen months old standing precariously at the top of the steep stairway. Concerned that the child might be nudged over the edge of the stairs during the arrest, he quickly went up to the second floor and brought the child downstairs.

With the child out of harm's way and the defendant in custody, Agent Burns followed Task Force Agent Martin down into the basement. From the top of the stairs leading to the basement, Agent Burns could see only the opposite wall. After descending the stairs, he proceeded to the left through a laundry area into another part of the basement and around to the side and back of the furnace. At this spot Agent Martin pointed out to Agent Burns a safe that he had located under a blanket or comforter near the furnace. The safe was approximately twenty-four inches high by seventeen inches wide by twenty-seven inches deep. It had been entirely covered by the comforter or blanket at the time Agent Martin first encountered it.[2]

Meanwhile upstairs, Agent Wales and other officers were in the process of completing the apprehension of the defendant. By moving promptly up the staircase and quickly locating the defendant, the agents had him under control within fifteen to twenty seconds after they first set foot inside the residence.

---

[2] This description of the premises is based on the court's observations during a view of 110 Carr Street taken during the hearing on the motion to suppress.

Agent Wales had the practice, even in situations where he was generally familiar with the arrestee, to request identification, and he did so in this case. The defendant responded that he did not have any identification on his person, but that it was in the night stand in the bedroom. Wales dispatched an officer to look for the identification, but the officer could not locate it due to a large number of clothes piled up in the room. At that point, Wales asked the defendant again where his identification was, and the defendant, now in handcuffs, indicated by pointing his shoulder to the area of the night stand. Officer Burns then pulled open the drawer in the night stand and found the defendant's wallet lying on top of a large amount of cash. The officers did not seize the cash, but merely noted it.

As they were taking the defendant downstairs, Burns indicated to Wales, in the defendant's presence, that they had found a safe in the basement. The defendant then volunteered the remark, "That's my safe." Earlier, as he was placing the defendant in handcuffs, Agent Wales had asked him whether there were any guns or drugs in the house, out of concern for the safety of the officers and the inhabitants, and the

7

defendant had responded that there was nothing in the house of this kind, but there was a large amount of cash. Finally, on the way to the squad car, the defendant asked what he was being arrested for. When the officers told him it was for drugs, he stated, "I don't do that any more; I'm in real estate."

Notably, during the course of the defendant's arrest no agents found it necessary to perform a protective sweep of the second floor area, even after the defendant was placed into custody. In addition, none of the agents shouted down into the basement before entering it to request that anyone down there show himself and come upstairs.

After transporting the defendant from the scene, the officers applied for a search warrant of the residence based upon their observations of the safe and of the large amount of cash in the night stand. The search warrant issued that day. As a result, the safe was opened, and two grocery bags containing currency in the amount of approximately $58,000 were found.[3] The officers also noticed a strong smell of

---

[3] The agents could not physically seize the safe because it was bolted to the floor; they brought a locksmith to the premises who opened the safe so that they could view and seize

cocaine inside the safe, seized a .45 caliber pistol and ammunition in a room adjoining the defendant's bedroom, and took into custody the currency in the night stand and a scale with white powder residue found in the bedroom closet.

### III. DISCUSSION.

The defendant contends that the court should suppress the evidence obtained pursuant to the search warrant, as well as the statements made to the officers at the time of his arrest, because the search warrant was issued on the basis of evidence observed by the arresting officers in violation of the Fourth Amendment.

In the course of placing a suspect under full custodial arrest, it is permissible for officers to conduct a limited, warrantless search of the suspect's person. The scope of this search may extend to the area "'within [the suspect's] immediate control' -- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Chimel v. California, 395 U.S. 752, 763 (1969). The extent of this permissible search area is

---

its contents.

sometimes referred to as the defendant's "wingspan."

Furthermore, when necessary, officers may conduct a "protective sweep" of the area to secure the safety of police officers or others. Maryland v. Buie, 494 U.S. 325, 327 (1990). To undertake a protective sweep, however, the officer must possess "'a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing,' that the area swept harbored an individual posing a danger to the officer or others." Id. (quoting Michigan v. Long, 463 U.S. 1032, 1049-50 (1983)) (internal quotations omitted). Even where a protective sweep is reasonably done, "the scope and manner of [the] search [are] 'strictly circumscribed by the exigencies which justify its initiation.'" U.S. v. Irizarry, 673 F.2d 554, 558 (1st Cir. 1982).

Applying these principles to the search conducted during the arrest of the defendant, the court must conclude that the cash in the night stand and the safe in the basement were observed in violation of the Fourth Amendment.

The search of the night stand cannot be justified as

incidental to the arrest nor by any doctrine of inevitable discovery. At the time the request for identification was made, the officers had the defendant secured and in custody in the hallway. While it was not impermissible for the officers to request Mr. Winston's identification upon apprehending him, no exception to the Fourth Amendment permits them to initiate a general search for identification when it is not on the arrestee's person. Moreover, since the defendant was apprehended in the hallway, his wallet cannot be considered as within his "wingspan." His indication in response to questioning of where his wallet could be found cannot be construed as a consent to search.

Neither does the doctrine of inevitable discovery protect the search of the night stand. Though "evidence which has been illegally obtained or derived from illegally obtained evidence must be suppressed," U.S. v. Silvestri, 787 F.2d 736, 740 (1st Cir. 1986), if the government can show by a preponderance of the evidence that the discovery of the evidence was inevitable, then the evidence will not be suppressed. See id. at 744, 746 (suggesting that courts focus

their analysis on independence and inevitability).[4]  In this case, sufficient support for the application of the inevitability exception is lacking.  As the First Circuit noted in <u>Silvestri</u>, "where a warrant is only sought after an illegal search reveals evidence of criminal activity, [the court begins] to worry whether the later warrant is truly inevitable and independent of the police misconduct."  <u>Silvestri</u>, 787 F.2d at 745 (discussing the Eleventh Circuit case, <u>U.S. v. Satterfield</u>, 743 F.2d 827 (11th Cir. 1984)).  The basis of the search warrant obtained here by the officers was, in part, their discovery of the cash in the night stand.  There is simply not enough evidence to support the contention that, had the agents sought a warrant without using the cash in the night stand as a basis, a warrant would have issued.

Likewise, the discovery of the safe in the basement was not made within the bounds of the Fourth Amendment.  The entry

---

[4]The First Circuit has focused on three questions to resolve the issue of inevitable discovery: "first, whether 'the legal means [are] truly independent'; second, whether 'both the use of the legal means and the discovery by that means [are] truly inevitable'; and, third, whether 'the application of the inevitable discovery exception either provide[s] an incentive for police misconduct or significantly weaken[s] fourth amendment protection.'"  <u>U.S. v. Scott</u>, 270 F.3d 30, 42 (1st Cir. 2001) (citing <u>Silvestri</u>).

into the basement and the removal of the cloth that concealed the safe in the far corner cannot be justified by any attempt to locate the defendant (who was under the control of the agents within seconds) or by any claim that a "protective sweep" was needed.  The agents had no need to search the basement for the defendant, having taken him into custody immediately upon entering the apartment.  The defendant did not deny that he was the person the agents sought.

In addition, there is no reasonable basis for a protective sweep of the basement.  The agents spent at least an hour observing the apartment before they entered it; they had no reason to suspect there were any others who might pose a threat to the officers in the apartment.  Furthermore, the agents could have secured the apartment without entering the basement, since the basement was only accessible through the door from the first floor.  Because there was no reason for the agents to search the basement, the officers' observations of it exceeded the limitations set by the Fourth Amendment.

Finally, the government cannot escape suppression of the evidence by invoking the good faith of the agents in these circumstances.   Evidence wrongfully seized will not be

13

excluded "where an objectively reasonable law enforcement officer relied in good faith on a defective warrant because suppression in that instance would serve no deterrent purpose." U.S. v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).

The government faces a "high hurdle" in showing that the good faith exception applies here because "critical information known to the officer [was] omitted from the warrant application." Id. Had the affidavit revealed the circumstances under which the evidence relied on for the search warrant had been obtained, the search warrant likely would not have issued. While there is no indication that any government agent intentionally manipulated the process in deliberate bad faith, the evidence is clear that a reasonable officer should have known that the observations of the cash and the safe violated constitutional boundaries. Suppressing the evidence under these circumstances serves a proper, and important, deterrent purpose. See id.

As for the statements made by Mr. Winston during his arrest, the court will suppress one of those as well. Mr. Winston would not have made the statement regarding his ownership of the safe had the agents not conducted the

improper search. See Nix v. Williams, 467 U.S. 431, 441 (1984) (discussing the exclusionary rule and how it includes "fruit from the poisonous tree," or in other words "the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence"). The other two statements were not the fruit of any constitutional violation and need not be suppressed.

## IV. CONCLUSION.

For the above reasons, the defendant's Motion to Suppress is hereby ALLOWED. The evidence obtained pursuant to the search warrant and the one statement made by the defendant regarding the safe will not be admitted during the trial on 04-CR-30026. This ruling does not appear to affect any evidence in 03-CR-30008. The government is ordered to notify the court on or before February 25, 2005 regarding its intent to proceed on 04-CR-30026.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge