*Filed 12/8/04*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DANIEL ALMONTE, )<br>    a/k/a "Checho," )<br>    a/k/a "Danny," )<br>)<br>CIRILO DELGADO, )<br>    a/k/a "Cecilio," )<br>)<br>CHARLES WINSTON, )<br>    a/k/a "Sweet Chuck" )<br>)<br>        Defendants. ) | Criminal No. 03-30008-MAP |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO PRE-TRIAL MOTIONS SUBMITTED BY DANIEL ALMONTE, CIRILO DELGADO AND CHARLES WINSTON

The United States of America, by Michael J. Sullivan, United States Attorney for the District of Massachusetts, respectfully submits the following response in opposition to pre-trial motions submitted by Daniel Almonte ("Almonte"), Cirilo Delgado ("C. Delgado") and Charles Winston ("Winston"). The United States also moves for leave to file this opposition, which exceeds twenty pages, under Local Rule 7.1(B)(4)

### INTRODUCTION

Three defendants, Almonte, C. Delgado and Winston have filed the following pretrial motions.[1]

---

[1] Another defendant, Pedro Delgado, has received an extension until November 29, 2004 to file his motions. The government's response to P. Delgado's motions is due December 13,

1.  <u>Daniel Almonte</u>

Almonte has filed a motion to suppress telephone conversations intercepted pursuant to two court-authorized wire taps.  He also has moved to suppress physical evidence (approximately two kilograms of cocaine and $10,000 in cash) seized by law enforcement agents from a Nissan Quest minivan on February 4, 2003, during the execution of a state search warrant; and physical evidence seized from his restaurant, El Valle, and at his residence, 116 Wilmont Street, Springfield, Massachusetts, on February 13, 2003, during the execution of two federal search warrants.  Finally, Almonte has moved to sever his case from his co-defendants.

2.  <u>Cirilo Delgado</u>

Like Almonte, C. Delgado has moved to suppress all court-authorized wire interceptions and all of the evidence seized during the search of the Nissan Quest.  In addition, C. Delgado has moved to exclude "opinion" evidence pertaining to the use of a dog trained to detect the presence of narcotics during the search of the Nissan Quest.  C. Delgado has further moved to suppress certain post-arrest oral statements made to law enforcement agents on February 13, 2004.  Finally, C. Delgado has also moved to sever his case from his co-defendants.

-------------------------

2004.

2

3.  <u>Charles Winston</u>

Winston has filed a motion to suppress all evidence (a firearm, ammunition, cash, and a scale containing cocaine residue) seized from his residence during the execution of a federal search warrant on October 15, 2003. Prior to the search, Winston was arrested at his home pursuant to an arrest warrant. After his arrest but prior to receiving his Miranda warnings, Winston made certain comments to law enforcement agents regarding the amount and source of cash found at his home. Winston has moved to suppress those statements. In addition, Winston challenges the legality of a protective sweep conducted by law enforcement agents when they first entered his residence to serve the arrest warrant.

For the reasons discussed below, the motions should be denied.

## FACTUAL BACKGROUND

Beginning in December, 2000, the Drug Enforcement Administration ("DEA") and other law enforcement agencies began conducting an investigation into the distribution of cocaine, crack cocaine and heroin by Jose Merced ("Merced"), Almonte, and others. Between December, 2000, and approximately September, 2002, the investigation focused on the sale of crack cocaine from 149 Cedar Street in Springfield and consisted mainly of physical surveillance, interviewing sources and cooperating witnesses and

3

review of public records (e.g. Registry of Deeds, motor vehicle information and telephone toll analyses). These investigative procedures revealed that Merced and "Carlos LNU" were operating a crack house at 149 Cedar Street and that Almonte was one of Merced's suppliers.[2]

Although Almonte and Merced were identified as key members of a drug distribution scheme by September, 2002, the government did not have sufficient evidence to arrest them. Nor did the government succeed in identifying all of Merced's co-conspirators. Moreover, of the co-conspirators who were identified, the government had learned only their first names or nicknames. For example, on July 9, 2002, a source of information told law enforcement agents that Merced, known to the source as "Chupi," cooked kilograms of cocaine at 143 Santa Barbara Street with his partner, identified only as "Chris LNU." Other individuals who allegedly worked at the crack house were identified as "Polack," "Melvin," "Anthony," and "Papito." The government was not able to fully identify these individuals, nor was it able to identify other suppliers and customers. The government also was unable to learn the dates, times, and places when large quantity drug deliveries were planned or any significant information about how Merced or Almonte were

---

[2] "Carlos LNU" was subsequently identified as Carlos Morales.

4

disposing of their drug proceeds.

The investigation received a substantial boost in mid-August, 2002, when the DEA office in Springfield received information from the New York Field Division indicating that Merced had contacted a member of a large drug trafficking organization based in New York City. That organization was responsible for importing large quantities of heroin and cocaine into New York City from Colombia, Puerto Rico and the Dominican Republic. The drugs were then transported from New York City to other locations, including Springfield, Massachusetts, for redistribution.

As a result of a Title III investigation initiated in July, 2002, by the New York City DEA field office, law enforcement agents began to identify the New York-based members of the organization. Subsequent information obtained from the New York intercepts revealed that Merced used cellular telephone number 413-246-4920 to facilitate his drug distribution scheme.

Accordingly, on November 15, 2002, the government applied for authorization to intercept wire communications over Merced's cellular telephone. Senior United States District Judge Frank H. Freedman approved the government's application and issued an order authorizing the interception of telephone calls to and from Merced's cellular telephone. (Hereinafter referred to as the "Merced Intercept"). Pursuant to that court order, law

enforcement agents began monitoring Merced's telephone calls on November 19, 2002, and concluded on December 18, 2002. Based, in part, on information learned during the course of the Merced Intercept, the government sought and obtained a court order on January 15, 2003, from Senior United States District Judge Frank H. Freedman authorizing the interception of calls being made to and from a cellular telephone primarily used by Daniel Almonte. (Hereinafter referred to as the "Almonte Intercept"). Monitoring of Almonte's telephone began on January 16, 2003, and concluded on February 13, 2003.

During the course of the wiretap investigation, law enforcement agents intercepted hundreds of narcotics related telephone calls between Merced, Almonte, C. Delgado and others. Just prior to the conclusion of the Almonte Intercept, a federal grand jury returned an indictment charging Merced, Almonte, C. Delgado and eleven co-conspirators with conspiracy to possess with intent to distribute cocaine, cocaine base and heroin (Count One). Almonte and C. Delgado were also charged with possession with intent to distribute cocaine and cocaine base (Count Three). Two days later, on February 13, 2003, search warrants were executed at the residences of Merced, Almonte, and various other co-defendants, during which powder cocaine, crack cocaine, and firearms were seized.

The grand jury subsequently returned two superseding

6

indictments, on June 17, 2003, and October 14, 2003.  The superseding indictments charged thirteen additional co-conspirators (including Winston) and added various substantive drug and firearm charges.  Neither superseding indictment altered the charges against Almonte or C. Delgado.

Thereafter, on May 11, 2004, Winston was charged in a separate indictment with distribution and possession with intent to distribute cocaine (Count One) and possession of a firearm in furtherance of a drug trafficking crime (Count Two) based on the evidence seized at the time of his arrest.  On July 26, 2004, the government moved to join the May 11, 2004, indictment with the October 14th second superseding indictment.  Winston has opposed the government's motion.  This issue has been briefed by the parties and is scheduled for oral argument on December 21, 2001.

**ARGUMENT**

## I.  **ALMONTE'S AND C. DELGADO'S MOTIONS TO SUPPRESS WIRE COMMUNICATIONS SHOULD BE DENIED.**

Almonte and C. Delgado challenge two wiretap orders issued by the late Senior Judge Frank Freedman, authorizing the interception of communications occurring over two cellular telephones that were being used by Merced, Almonte, and their associates to distribute vast quantities of cocaine, crack cocaine, and heroin.  The wiretap application for the Merced Intercept was supported by an affidavit dated November 15, 2002, submitted by DEA Special Agent Greg Wales (hereinafter the "Wales

7

affidavit"). A redacted copy is attached hereto as Exhibit A. The wiretap application for the Almonte Intercept was supported by an affidavit dated January 15, 2003, submitted by DEA SA Robert Olsen (hereinafter the "Olsen affidavit"). A redacted copy is attached hereto as Exhibit B.

Almonte and C. Delgado each claim that the Wales and Olsen affidavits do not satisfy the "necessity" requirement of section 2518(1)(c) of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 22510, et. seq. ("Title III"). Specifically, Almonte and C. Delgado allege that the facts set forth in the Wales and Olsen affidavits were not adequate to support Senior Judge Freedman's finding that "normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous." (M.B.D. No. 02-30063-FHF ¶ d, M.B.D. 03-30004 ¶ d). Almonte and C. Delgado also claim that there was insufficient probable cause to believe that Merced and Almonte's cellular telephones were being used to facilitate drug trafficking.[3]

---

[3] Almonte makes two additional claims. First, he alleges that the wiretap order authorizing interception is "insufficient on its face." (See p. 2 of Almonte's Motion to Suppress Evidence obtained by Unlawful Electronic Surveillance). Second, he claims that the interceptions were not made "in accordance with the order of authorization or approval." (Id.). Neither argument is supported by any legal or factual analysis. Accordingly, these arguments should be summarily dismissed. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir 1990)(reaffirming the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some developed argumentation are deemed waived).

8

Contrary to Almonte and C. Delgado's assertions, there is no basis for suppressing the telephone conversations at issue. As set forth below, the Wales and Olsen affidavits contained a full and detailed account of the investigative procedures that had been employed during the pre-wiretap phase of the investigation. Both affidavits explained the ways in which those procedures had succeeded and the ways in which they had fallen short. The affidavits also explained, in detail, why other investigative procedures were unlikely to succeed or were too dangerous to employ. Those facts were more than minimally adequate to support Senior Judge Freedman's finding. Finally, the affidavits provided ample support for Senior Judge Freedman's finding of probable cause to believe that interception of wire communications occurring over Merced and Almonte's cellular telephones would yield evidence of illegal narcotics activity.[4]

## A.    **Standard of Review.**

Title III states that a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they

---

[4] Almonte and C. Delgado have chosen to attack both affidavits while making little or no effort to distinguish between them. Instead, the defendants describe the content of the affidavit and then collectively brand them as "inadequate." Accordingly, although the government's opposition cites to specific paragraphs in each of the affidavits, for the most part, the affidavits are discussed together.

reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The First Circuit has repeatedly "interpreted that provision to mean that the statement should demonstrate that the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to'" a wiretap. United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003) (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)). The First Circuit has also emphasized that

> the government does not need to exhaust all other investigative procedures before resorting to wiretapping. Nor must ordinary techniques be shown to have been wholly unsuccessful. Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence -- to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.

United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir.) (citing cases), cert. denied, 477 U.S. 908 (1986); accord Villarman-Oviedo, 325 F.3d at 9. Put another way,

> An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression.

United States v. David, 940 F.2d 722, 729 (1st Cir.), cert.

denied, 502 U.S. 989 (1991); accord United States v. Corrado, 227 F.3d 528, 539 (6ᵗʰ Cir. 2000) (holding that purpose of section 2518(1)(c) "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques") (citation and internal quotation marks omitted).

A district judge who reviews a wiretap application in the first instance must not, the First Circuit has cautioned, apply a "rigid or rule-oriented" approach to the application's adequacy. David, 940 F.2d at 728. On the contrary, "'Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness.'" Id. (quoting United States v. Urib, 890 F.2d 554, 556 (1ˢᵗ Cir. 1989)). That is especially true where the wiretap investigation targets a drug organization. "Because drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches." David, 940 F.2d at 728.

A district judge asked to review *another* district judge's decision to approve a wiretap application has an even more limited role: "The reviewing court examines the face of the affidavit and 'decide[s] if the facts set forth in the

11

application were *minimally adequate* to support the determination that was made.'" <u>Villarman-Oviedo</u>, 325 F.3d at 9 (emphasis added) (quoting <u>United States</u> v. <u>Ashley</u>, 876 F.2d 1069, 1074 (1st Cir. 1989)).  Thus, it is not the role of the reviewing judge to second-guess the issuing judge, or to ask whether she herself would have issued the warrant, but rather to determine if the issuing judge's decision was reasonable.  <u>See</u> <u>United States</u> v. <u>Lopez</u>, 300 F.3d 46, 53 (1st Cir. 2002).

**B.    <u>The Facts Set Forth in the Wales and Olsen Affidavits Were More than Minimally Adequate to Support Senior Judge Freedman's Determination That Section 2518(1)(c)'s Requirements Had Been Met.</u>**

Almonte and C. Delgado claim that the facts in the Wales and Olsen Affidavits were not even minimally adequate to support Senior Judge Freedman's determination that "normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous."  Their arguments fall into two general categories.  First, they claim that the government had already achieved all of its legitimate goals during the investigation's pre-wiretap phase.  Second, they claim that the government could have achieved any remaining legitimate goals using normal investigative means, rendering Senior Judge Freedman's decision to issue a wiretap warrant unreasonable.  This second argument can be divided further into two parts: (a) that the government could have achieved its goals using normal investigative means that it had already employed

12

with success, and (b) that the government could have achieved its goals using normal investigative means that it purportedly neglected.

As a threshold matter, Almonte and C. Delgado disregard the standard of review that Senior Judge Freedman was required to apply to the government's application and that this Court is required to apply to Senior Judge Freedman's determination. The question for Senior Judge Freedman was not whether normal investigative procedures had proven wholly unsuccessful or had been completely exhausted, see Abou-Saada, 785 F.2d at 11, but simply whether, in light of the facts set forth in the affidavits, electronic surveillance was "a suitable next step in a plausible progression" of investigative techniques, David, 940 F.2d at 729. Similarly, the question for this Court is only whether the facts in the affidavits were "minimally adequate" to support Senior Judge Freedman's determination. Villarman-Oviedo, 325 F.3d at 9.

### 1.   The investigation's pre-wiretap successes did not preclude Senior Judge Freedman from concluding that the government had legitimate unmet goals.

Special Agent Wales specifically disclosed the investigation's pre-wiretap successes so that Senior Judge Freedman would be in the best position to determine whether a wiretap warrant should issue. (See Wales Aff. ¶¶ 13-28). The defendants, especially Almonte, review those successes at length

13

in their motions and then assert that the government had achieved all of its legitimate goals. However, Special Agent Wales also documented in detail the ways in which the goals of the investigation had not been met.

Similarly, Special Agent Olsen summarized the investigation's pre-wiretap successes including the information that was gleaned during the Merced Intercept. (See Olsen Aff. ¶¶ 17-43). Like Special Agent Wales, Special Agent Olsen also discussed the goals that the government had failed to achieve. (Olsen Aff. ¶ 44).

In addition, both affidavits explained in great case-specific detail the reasons why previously-used normal investigative procedures were unlikely to achieve the investigation's goals, and also why other normal investigative procedures were likely to fail or prove too dangerous. These explanations were at the very least minimally adequate to support Senior Judge Freedman's determination that the government *did* in fact have legitimate unmet goals and that normal investigative procedures were not sufficient to acheive the investigations remaining goals.

### a. Identification of source(s) of supply, customers, aiders and abettors and other co-conspirators.

Despite defendants' many assertions to the contrary, the pre-wiretap investigation of the Merced/Almonte organization did not reveal the full identity of many of its suppliers and major

14

customers.  For example, as discussed by SA Wales, in August,
2002, a confidential source (hereinafter referred to as "CS-1")
disclosed that he/she had purchased 62 grams of crack cocaine
from Merced in June, 2001.  CS-1 also disclosed information
regarding the sale of crack cocaine at 149 Cedar Street and
identified one close associate of Merced's as "D-Love."  (Wales
Aff. ¶¶ 14-15).  Another confidential source ("CS-2") provided
additional details regarding the sale of crack cocaine at 149
Cedar Street.  (Wales Aff. ¶ 16).  CS-2 identified a person known
as "Carlos," who lived on the third floor at 149 Cedar Street and
sold crack cocaine.  And finally, a source of information
("SOI-1") reported copious foot and vehicle traffic in the
vicinity of 149 Cedar Street.  (Wales Aff. ¶ 17).  SOI-1 is a
concerned citizen who was suspicious that 149 Cedar Street was
being used as a retrial outlet for crack cocaine sales.

     There is no doubt that an obvious (and obviously legitimate)
goal of the DEA's investigation was to fully identify Merced's
suppliers, major customers and other co-conspirators.  Here, CS-1
could only provide evidence against Merced.  He/She was not in a
position to do more, especially where, as set forth by SA Wales,
CS-1 had been arrested and was facing federal narcotics charges.
(Wales Aff. ¶ 15).  CS-2's and SOI-1's information was even less
helpful in meeting the investigation's goal of identifying the
organization's major suppliers, customers and co-conspirators.

15

Indeed, after debriefing CS-2, the DEA learned only the first name ("Carlos") of the primary resident of 149 Cedar Street. Moreover, SA Wales reported that CS-2 did not have direct contact with anyone other than "Carlos." Thus, despite the DEA's success in identifying "D-Love," they were unable to fully identify "Carlos" and had no information regarding Merced's suppliers or customers.

The DEA experienced the same investigative shortfalls during the period leading up to the Almonte Intercept. To be sure, the DEA obtained valuable evidence during the Merced Intercept. All of this evidence, including the identification of three of Merced's associates, Carlos Morales, David Gonzalez, Zenia Sanchez and at least one co-conspirator, Taiwan Jones, was described by SA Olsen. (See Olsen Aff. ¶ 19a-d). Nonetheless, the DEA still was unable to identify Almonte's major suppliers. For example, on November 20, 2002, DEA intercepted a conversation between Merced and Almonte wherein Almonte explains that he must pay "Porfirio." (Olsen Aff. ¶¶ 20-21). The content of the conversation indicates that "Porfirio" is a major supplier of narcotics for Almonte. SA Olsen and other law enforcement agents were not able to identify "Porfirio" during the pre-wiretap investigation.

In another conversation between Merced and Almonte intercepted later that same day, Merced refers to a customer

named "Pete" who appears to owe Merced a considerable sum.
(Olsen Aff. ¶¶ 22-23). "Pete" was not identified during the pre-
wiretap investigation or during the Merced Intercept. Thus,
notwithstanding the successes of the Merced Intercept, as stated
by SA Olsen, not all of Almonte's suppliers, customers or aiders
and abettors had been identified prior to January, 2003.

In short, despite the DEA's success in identifying some
members of the Merced/Almonte drug ring during the
investigation's pre-wiretap phase and then through the Merced
Intercept, Senior Judge Freedman had more than minimally adequate
facts from which to conclude that other drug suppliers and major
customers had not yet been identified. See United States v.
Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002) (rejecting
defendant's claim "that the evidence that the government obtained
from less intrusive investigatory methods [had] provided
sufficient information about the target organization, thereby
eliminating the need for wiretaps," because, among other things,
"the government was still unaware of the identity of many of the
conspiracy's members and the supplier of its drugs").

b.    **Acquisition of evidence sufficient to convict the target subjects and other co-conspirators.**

Another unmet goal of the pre-wiretap investigations was to
obtain sufficient evidence to convict both already-identified and
still-unidentified members of the Merced/Almonte organization.
(Wales Aff. ¶ 30; Olsen Aff. ¶ 44). For example, the DEA

17

received information at the investigation's earliest stages that Merced, "D-Love," and "Carlos" were in the drug business but the government was unable to identify their respective roles, let alone obtain sufficient evidence to convict them. Similarly, the DEA had insufficient evidence to convict any of the Almonte's suppliers who remained unidentified or only partly identified (e.g. "Porfirio"). (Olsen Aff. ¶¶ 20-21). These were surely facts from which Senior Judge Freedman could reasonably conclude that the investigation had legitimate unmet goals.

c.   **Identification of the organization's methods, manner, and means.**

The pre-wiretap investigation also failed to reveal the method, manner, and means in which Merced, and later Almonte, conducted their drug activities. Despite evidence that Merced used 149 Cedar Street to distribute drugs, prior to initiating the Merced Intercept the DEA had no idea who, other than "Carlos" was selling the drugs, or where and to whom the drugs were being delivered. Similarly, despite intercepting conversations between Merced and Almonte during the Merced Intercept, it still was not clear whether Almonte and Merced had the same suppliers or different suppliers, a fact with obvious implications for the investigation's future direction.

In addition, the investigation had turned up practically no information about the Merced/Almonte organization's money laundering activities. Because information about these matters

18

was needed to plot the future course of the investigation, the
failure to obtain it was yet another legitimate unmet
investigative goal.

In sum, the pre-wiretap successes in this case were no more
extensive than those in other cases in which wiretap warrants
were issued by district judges and upheld by the First Circuit.
In United States v. Ashley, supra, for example, the pre-wiretap
investigation lasted six months and involved "various purchases
of controlled substances by two undercover agents," "numerous
[consensually recorded] telephone conversations" between one
defendant and the undercover agents, physical surveillance of the
controlled purchases "and other rendezvous," and the use of pen
registers.  876 F.2d at 1074.  Nevertheless, the First Circuit
reversed the district court's suppression decision, holding that
the wiretap application complied with section 2518(1)(c)'s
requirements.

Similarly, in United States v. Lopez, supra, the pre-wiretap
investigation included controlled drug purchases by DEA
undercover agents from members of a drug conspiracy; use of a
confidential informant to identify other members of the
conspiracy; and visual surveillance and pen-register analysis.
300 F.3d at 49-50.  Notwithstanding this productive pre-wiretap
investigation, the First Circuit turned aside a section
2518(1)(c) challenge to the wiretap warrant.  The court reasoned

that, even though various investigative "techniques (such as
physical surveillance, interrogation of informants, pen-register
analysis, and controlled buys by undercover agents) had proven
valuable in the past," a wiretap was a reasonable next step in
the investigation.  Id. at 53.

     And in United States v. Soto-Del Valle, 102 F.Supp.2d 57,
59-60 (D. P.R. 2000), aff'd, 325 F.3d 1 (1st Cir. 2003), the
district court rejected a section 2518(1)(c) challenge where the
government indicated that it had already "identified the main
targets of the investigation . . . but not the other co-
conspirators," and where the wiretap applications "indicated that
the Government expected to confirm the specifics of the drug
trafficking and money laundering offenses, including: (1) the
identities and roles of accomplices, aiders and abettors, co-
conspirators, and participants; (2) the locations and sources and
resources used to finance the illegal activities; and (3) the
locations and items used in furtherance of the illegal
activities."

     Once again, these cases demonstrate that Senior Judge
Freedman acted reasonably in determining that the Merced/Almonte
investigation still had legitimate, unmet goals following the
pre-wiretap phase of the investigation.