2. **The Wales and Olsen Affidavits adequately explained why normal investigative procedures had been tried and had failed, were reasonably unlikely to succeed if tried, or were too dangerous to try, with respect to the investigation's remaining goals.**

In pertinent part, 18 U.S.C. § 2518(1)(c) obligates the government to provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This provision "is not designed to force the government to have exhausted all other investigative procedures." United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977)(internal quotations omitted). Rather, its only purpose is to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." Id. (citing United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974)). The government's affidavit need only indicate a "reasonable likelihood" that alternative techniques would fail to fully expose the crime. See United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989); see generally Indelicato v. United States, 106 F. Supp 2d 151 (D. Mass. 2000).

To comply with this statutory directive, the Wales and Olsen affidavits detailed the considerable time, effort, and resources expended by the DEA in pursuing conventional investigatory methods prior to obtaining authorization for a wiretap. As the

21

Court properly concluded, these efforts fully satisfied the government's obligation under section 2518(1)(c).

    **a.   Cooperating witnesses/sources.**

Almonte and C. Delgado each claim that the government failed to make adequate use of its cooperating witnesses. With respect to the Merced Intercept, the defendants' chief argument appears to be that CS-1 and CS-2 were so successful in making controlled purchases from 149 Cedar Street that they could eventually have accomplished all of the investigation's goals without resort to a wiretap. The Wales affidavit made no attempt to minimize the successes of CS-1 and CS-2. On the contrary, Special Agent Wales acknowledged those successes and documented them in great detail. (Wales Aff. ¶¶ 15, 16). Special Agent Wales also explained, however, why the use of cooperating sources probably could not achieve the investigation's remaining goals. (Wales Aff. ¶ 38).

First, although CS-1 had purchased crack cocaine for Merced in the past, that transaction was not surveilled or monitored by the DEA. There was little to no possibility to arrange for future controlled purchases of narcotics and certainly no possibility of CS-1 being able to infiltrate Merced's network. Second, as noted by SA Wales, "because CS1 was arrested by DEA in November, 2004, CS1 believes that Merced will not conduct any narcotics transactions with CS1 due to Merced's fear of CS1 working with law enforcement." (Wales Aff. ¶ 15).

22

CS-2's usefulness was similarly limited. Although CS2 was able to provide information regarding criminal activity at 149 Cedar Street, he/she was not able to purchase large quantities from the more culpable members of the conspiracy. SA Wales' affidavit states: "CS2 stated that the residents of 149 Cedar Street are cognizant of law enforcement in the area and will not sell CS2 larger quantities of crack cocaine for fear of CS2 being arrested and subsequently tipping law enforcement to the dealing at the residence." (See Wales Aff. ¶ 11).

The defendants also ignore CS-1's and CS-2's inherent limitations in achieving the investigation's stated goal of obtaining evidence sufficient to convict all conspiracy members. As a cooperating witness with pending cases who stood to gain from his/her cooperative efforts, CS1 was open to impeachment on this ground at trial. Courts have recognized that wiretaps are an appropriate way for the government to obtain corroborating evidence of crimes. See, e.g., United States v. Bennett, 219 F.3d 1117, 1122-23 (9th Cir. 2000) (rejecting argument that "the informant Chambers's ability and willingness to participate in the investigation indicates that further use of this traditional technique could have been productive and nullifies the government's plea of necessity" in part because "Chambers's credibility as a paid government informant would be under attack and would therefore require further corroborating evidence")

23

(citing cases).

CS-2 was similarly open to impeachment albeit on difference grounds. As noted in Wales' affidavit CS-2 provided information with the expectation that he/she would receive compensation. (Wales Aff. ¶ 16). And, in any event, CS-2 simply could not penetrate the drug conspiracy to the extent necessary to obtain sufficient evidence for a conviction.

Given the facts set forth in the Wales Affidavit, Senior Judge Freedman could reasonably have concluded that, despite CS-1's and CS-2's past successes, they would not be able to achieve the investigation's remaining goals because they could not probe more deeply than they already had into Merced's organization's structure.

Almonte and C. Delgado make the same arguments regarding the use of cooperating witnesses with respect to the Almonte Intercept. Once again, their main complaint is that the government failed to develop cooperating witnesses. However, like with the Merced Intercept, there were no cooperating witnesses that could advance the investigation towards its stated goals. While it is true that additional cooperating witnesses were available by January 15, 2003, they were either not in a position to deal directly with Almonte or refused to testify in court. For example, one of Merced's customers, Taiwan Jones, was arrested on December 12, 2002, shortly after picking up a large

24

quantity of crack cocaine from Merced. Although Jones gave a statement to the Springfield Police Department admitting his criminal involvement with Merced, he could not identify Merced. Also, SA Olsen acknowledges in his affidavit that he was aware of another cooperating witness who claimed he/she could purchase narcotics from Almonte, but noted that this person was unwilling to testify in court. (Olsen Aff. ¶ 57). In any event, one or more purchases of narcotics from an informant would not have provided sufficient information to identify Almonte's source or other major customers. Because of the nature of Almonte's distribution scheme, SA Olsen specifically concluded that the cooperating witnesses were not likely to learn such things as the organization's source of supply, other customers, storage locations or methods of laundering or hiding drug proceeds. (Olsen Aff. ¶¶ 44, 56-57).

### b. Use of Grand Jury.

SA Wales and SA Olsen also explained that the government did not believe that use of the grand jury would accomplish the goals of the investigation. (Wales Aff. ¶ 37; Olsen Aff. ¶ 55). They stated that the targets or other co-conspirators would likely invoke their constitutional rights if subpoenaed. Both Wales and Olsen further noted that it would be unwise to seek immunity as that could foreclose prosecution against some of the most culpable members of the conspiracy. Finally, Wales and Olsen

25

opined that premature use of the grand jury would compromise the investigation by alerting Merced, Almonte and others. (Wales Aff. ¶ 37; Olsen Aff. ¶ 55).

### c. Search Warrants.

SA Wales and SA Olsen's affidavits also explained why the execution of search warrants in lieu of electronic surveillance would not have been effective. (Wales Aff. ¶¶ 42-43; Olsen Aff. ¶¶ 60-61). SA Wales explained that although two search warrants had been obtained by state law enforcement authorities for 149 Cedar Street, little or no narcotics were found. In addition, Wales learned during the course of the investigation that Merced stated that he did not carry anything illegal in his car. (Wales at ¶ 42). Similarly, SA Olsen indicated that the execution of search warrants with respect to Almonte would be futile as the DEA had not yet determined where Almonte stored his narcotics. (Olsen Aff. ¶ 60). Finally, according to both Wales and Olsen, the execution of search warrants would have alerted the targets of the investigation to the scrutiny of federal law enforcement and would have thwarted efforts to expand the investigation. (Wales Aff ¶ 43; Olsen Aff. ¶ 61).

### d. Pen Register, Trap and Trace & Toll Records.

Toll record, pen register, and trap and trace information were extensively used in the investigation prior to the issuance of the Merced Intercept and throughout the period leading to the

26

request for the Almonte Intercept. Although telephone information had been useful in confirming agents' suspicions that Merced, Almonte, and others were jointly engaged in the distribution of cocaine and heroin, it produced only limited results in reaching the goals of the investigation.

Agents Wales and Olsen explained that continued use of pen registers was likely to be futile in accomplishing the stated goals of the investigation for two main reasons. First, use of pen registers comes with the accompanying burden of having to identify every telephone used to contact the targeted telephones, and then installing pen registers on every one of those telephones. Between July 13, 2002 and November 12, 2002, Merced's telephone was making and receiving approximately 8900 calls to over 300 different telephone numbers. (Wales Aff. ¶ 29a). Between December 19, 2002, and January 13, 2003, Almonte's telephone placed or received approximately 1950 calls to or from over 168 different telephone numbers. (Olsen Aff. ¶ 40a). In addition, there was no way for the government to identify, with any degree of certainty, all of the different telephones used by the members of this conspiracy. (Wales Aff. ¶ 44; Olsen Aff. ¶ 62). Second, even if there was a less burdensome way of obtaining this information, the investment in time and effort was deemed impracticable, because the type of information that pen registers and trap and trace devices record are limited. For

27

example, they do not reveal the identity of the parties to a conversation, or, more importantly, the nature and substance of any given conversation. They also cannot differentiate between legitimate calls and those made for criminal purposes, nor can they identify the source or sources of the controlled substances, or in and of themselves, establish proof of the conspiracy.

    e.   **Physical Surveillance.**

SA Wales and Olsen also explained the substantial amount of time and effort that had been put into surveillance activities prior to obtaining the Merced and Almonte Intercepts. (Wales Aff. ¶¶ 32-86; Olsen Aff. ¶¶ 46-54). However, surveillance was only partially successful in advancing the investigation. For example, while law enforcement agents had conducted surveillance at 149 Cedar Street, the surveillance was of limited utility because Merced was not often observed at that address and the narcotics transactions occurred <u>inside</u> the residence. (Wales Aff. ¶ 32). SA Wales further reported that surveillance of vehicles used by Merced was unsuccessful. (Wales Aff. ¶ 33). SA Wales explained that one of Merced's vehicles, a Mitsubishi Montero, had heavily tinted widows and therefore it was difficult to determine the identity of the driver or the occupants. (Wales Aff. ¶ 36). Law enforcement agents encountered even more difficulty when they attempted to surveil Almonte. (Olsen Aff. ¶¶ 46-51). SA Olsen described numerous instances where law

28

enforcement agents observed Almonte and his associates conduct counter surveillance. On other occasions, Almonte observed law enforcement agents and warned Merced that he was being watched. (Olsen Aff. ¶ 46).

In addition to the particular problems encountered in attempting to conduct surveillance of Merced and Almonte during the course of the investigation, other difficulties of a more general nature were also described by Wales and Olsen, including the inefficiencies of physical surveillance conducted without direction or timing and the inability of physical surveillance to produce a complete understanding of the scope of the drug organization under investigation. (Wales Aff. ¶ 34; Olsen Aff. ¶ 52). Physical surveillance also posed a serious threat of detection. Id.

These efforts, when combined with the failure of the investigation to achieve legitimate investigatory objectives prior to December 15, 2002, afforded the Court with a reasonable basis to conclude that the government adequately established that normal investigative procedures had been tried and failed, reasonably appeared to be unlikely to succeed if tried, or were too dangerous to employ. See e.g. United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002)(necessity shown because government affidavit detailed surveillance techniques which had been tried, such as physical surveillance, pen registers, records

checks, and debriefings, and described why those tactics had been ineffective).

C. **The Wiretap Orders Were Based on Ample Probable Cause**.

Almonte and C. Delgado each claim that there was insufficient probable cause to issue the wiretap orders. Other than baldly stating that there was no probable cause, Almonte provides the Court with no argument or analysis in support of his position. Accordingly, his claim should be rejected out of hand. C. Delgado adds little more. C. Delgado claims there was no probable cause to issue the Merced Intercept order because SA Wales "relies on information from confidential informants and sources of information who have absolutely no track record of reliability from past investigations." C. Delgado also argues that the informants are unreliable because they "have a motive to fabricate." C. Delgado then states that because there was no probable cause to issue the Merced wiretap, the Almonte wiretap is tainted under the "fruit of the poisonous tree doctrine." Because the only affidavit at issue is the one supporting the Merced Intercept, the government will address SA Wales' affidavit only.

The probable cause standard set forth in Title 18 U.S.C. § 2518(3)(a) and (b) is the same as that used to obtain ordinary search warrants. See United States v. Fury, 554 F.2d 522, 530 (2d Cir. 1977). Thus, the existence of probable cause is

30

determined by looking at the "totality of the circumstances." This determination is a practical, common sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213 (1983). For the issuance of a wiretap order, probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime. United States v. Fairchild, 189 F.3d 769 (8th Cir. 1999).

Title 18 U.S.C. 2518(3)(d) establishes three alternative bases for establishing probable cause: (1) that the target facilities are being used or are about to be used in connection with an enumerated offense; (2) that the target facilities are leased to or listed in the name of an individual believed to have committed an enumerated offense; or (3) that the target committed an enumerated offense.

Contrary to C. Delgado's assertions, the facts set forth in the Wales Affidavit provided ample probable cause to believe that Merced's cellular telephone was used in connection with a drug trafficking crime and that electronic monitoring of the phone would reveal information such as the identities of his suppliers and major customers and the dates, times, and places of future drug deliveries.

First, Merced was intercepted pursuant to a wiretap

31

conducted by DEA New York Division using his cellular phone to communicate with "Carlitos" regarding the purchase of 5 or 6 kilograms of cocaine. (Wales Aff. ¶¶ 25, 26, 28). In addition, toll analysis and pen register information showed that over a 104-day period Merced placed or received approximately 8,900 calls to or from over 300 different telephone numbers. Toll analysis also showed that at least seven calls were placed or received over Merced's cellular telephone to "Carlitos" in New York and that during a 46 day period, from September 27, 2002, to November 12, 2002, 609 calls were placed or received from a Verizon Wireless cellular telephone number subscribed to by Manuel Colon, a/k/a "D-Love," who was suspected of being involved in drug activity. (Wales Aff. ¶¶ 12, 15, 33). This evidence indicated that Merced used his cellular phone to conduct drug transactions with others. See e.g. United States v. Diaz, 176 F.3d 52, 109 (2nd Cir. 1999)(probable cause for wiretap because affidavit set forth specific instances when defendant used phone to engage in illegal activities, and pen register showed numerous instances when defendant contacted others suspected to be involved in drug activity).

32

II. **ALMONTE'S AND C. DELGADO'S MOTIONS TO SUPPRESS EVIDENCE SEIZED DURING THE SEARCH OF A NISSAN QUEST MINIVAN SHOULD BE DENIED.**

Almonte and C. Delgado have filed motions to suppress drugs (two kilograms of powder cocaine) and money (approximately $10,000 in cash) seized from a Nissan Quest minivan that C. Delgado was driving on the evening of February 4, 2003, on the grounds that the initial stop of the minivan was not justified. C. Delgado further argues that the search of the minivan, which was conducted pursuant to a state search warrant, was not supported by probable cause. For the reasons discussed below, the motions should be denied.

A. **Background.**

During the late afternoon and early evening on February 4, 2003, DEA agents who were monitoring the Almonte Intercept learned that Merced, who needed some powder cocaine for a customer, arranged to obtain cocaine from Almonte. The intercepted conversations between Merced and Almonte indicated that Merced was waiting at the home of David Gonzalez and Zenia Sanchez located at 27 Federal Street in Springfield for a delivery of cocaine. During the course of the investigation, DEA agents had learned that Merced frequently used the Gonzalez-Sanchez residence to cook and package crack cocaine. Once Almonte indicated to Merced that he was sending C. Delgado to 27 Federal Street to make the delivery, law enforcement agents began

33

their surveillance.  They observed C. Delgado leave Almonte's restaurant, El Valle, located on Carew Street in Springfield and drive a gray 1997 Nissan Quest minivan toward Federal Street. The Nissan Quest was registered to Eddie Alfonso Ortiz, although law enforcement agents frequently observed Almonte driving the vehicle.  C. Delgado made several turns down nearby streets before pulling into the parking lot for the apartment complex at 27 Federal Street.  C. Delgado remained in the lot for a few moments before departing.  Before long, C. Delgado observed law enforcement agents conducting surveillance.  C. Delgado then called Almonte and told him to warn Merced.  C. Delgado stated:

| | |
|---|---|
| CHECHO: | Hello. |
| CECILIO: | Call him up, call Chupi... |
| CHECHO: | Uh-huh. |
| CECILIO: | ... and tell him not to do anything... I mean, not to get out of there because there are two detective cars by the dealer, plus two detective cars where Chupi hides, facing that way. |
| CHECHO: | Uh-huh! |
| CECILIO: | Yeah, just now. And a police car at the liquor store, behind the liquor store. |
| CHECHO: | Damn! Do you think they're going to go to that guy's? |
| CECILIO: | I don't know but listen... right now, there's another police car as well. So I don't know, maybe they would have stopped me as well, I don't know. If that were the case. You know what I mean? |

34

| | |
|---|---|
| CHECHO: | Uh-huh. |
| CECILIO: | So tell them to be careful. Tell him there's a police car with the lights off, behind the liquor store facing his house... there are two detectives, one right behind the other one where Chupi hides and the other one by the dealer. |
| CHECHO: | All right. I'll let him know right away. |
| CECILIO: | Bye. |

Moments later C. Delgado was stopped by the police. He immediately notified Almonte:

| | |
|---|---|
| CHECHO: | Hello! |
| | [VOICES OVERLAP] |
| CECILIO: | Hello! |
| CHECHO: | Uh-huh. |
| CECILIO: | [U/I] [CUTS OFF] |
| CHECHO: | Huh? What's up? Hello! |
| | [VOICES OVERLAP] |
| CECILIO: | Hello! |
| CHECHO: | Uh-huh. |
| CECILIO: | They got me pulled over! |
| CHECHO: | They do! |
| CECILIO: | Yes. On Worthington! |
| CHECHO: | The narcs? |
| CECILIO: | On Worthington and Florida. |

35

| | |
|---|---|
| CHECHO: | The narcs? |
| CECILIO: | The police. |
| CHECHO: | ...[STUTTERS]... Which ones? The... which ones? |

[CALL GETS DISCONNECTED][5]

At the direction of the DEA, Springfield police officer Edward Kalish stopped had C. Delgado on Worthington Street. As he was approaching the vehicle, Officer Kalish observed C. Delgado reach behind the driver's seat with both hands. Officer Kalish also observed a baseball bat between the front seats. Springfield Police Officer C. Howard then arrived to assist with his K-9 "Shaka." "Shaka," who is trained to detect the odor of narcotics, alerted to the floor and interior wall area directly behind the driver's seat. Officer Kalish and other officers then examined the area and observed a partially filled paper bag inside the inner wall of the vehicle just below the back seat window behind the driver's seat.

The vehicle was subsequently seized and towed to the Springfield Police garage. A state search warrant for the vehicle was obtained and executed. During the search, law enforcement agents found a hidden compartment, commonly referred to as a "trap," in the inner wall behind the driver's seat. The compartment could be operated electronically. Two bricks of

---

[5] The conversations consist of preliminary translations that have been or will be corrected, as necessary, prior to trial.

cocaine each weighing approximately one kilogram were seized from the compartment. The compartment also contained $10,000 and a scale.[6]

As an initial matter, Almonte and C. Delgado lack standing to move to suppress the cocaine and money found in the Nissan Quest. Even assuming that Almonte and C. Delgado have standing, law enforcement agents had probable cause, derived from court authorized wiretaps, to believe that C. Delgado was using the Nissan Quest to transport cocaine. Indeed, the conversations between Almonte, Merced and C. Delgado - standing alone - provided ample probable cause to search the vehicle.

B. **Almonte and C. Delgado Lack Standing To Challenge the Search.**

A defendant who seeks to suppress evidence on the ground that it was obtained in violation of the Fourth Amendment must first demonstrate that he had a "reasonable expectation of privacy" in the area searched and in relation to the item seized. United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994); United States v. Kimball, 25 F.3d 1, 9 (1st Cir. 1994). The defendant bears the burden of persuading the district court not only that he exhibited a subjective expectation of privacy, but that society accepts that expectation as objectively reasonable.

---

[6] C. Delgado was charged with narcotics offenses in state court. These charges were dismissed after he was indicted by a federal grand jury.

37

Lewis, 40 F.3d at 1333; Kimball, 25 F.3d at 9. Because "Fourth Amendment rights are personal and may not be asserted vicariously," Almonte and C. Delgado must each demonstrate standing with respect to the Nissan Quest in order to prevail on their suppression motions. United States v. Sanchez, 943 F.2d 110, 112 (1st Cir. 1991). Here, neither Almonte or C. Delgado have presented this Court with any evidence via affidavit or otherwise that demonstrates their expectation of privacy in the Nissan Quest. As a result, they have failed to meet their burden of establishing standing and they cannot challenge the search and seizure of cocaine and money from the Nissan Quest. See e.g. United States v. Aguirre, 859 F.2d 854, 856-857 (1st Cir. 1998)(finding no standing where, inter alia, record was "barren of proof" tending to show defendant's subjective expectation of privacy in vehicle).

C. **The Initial Stop of the Nissan Quest Constituted a Legitimate Investigatory Stop.**

Even assuming that Almonte and C. Delgado may challenge the search of the Nissan Quest, their claim fails on the merits. First, the initial stop of the Nissan Quest was completely justified as an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968). In Terry v. Ohio, the Supreme Court recognized that the police must be free to pursue what it termed a "legitimate investigative function." 392 U.S. at 21. Hence "a police officer may in appropriate circumstances and in an appropriate

38

manner approach a person for purposes of investigating possibly criminal behavior even through there is no probable cause to make an arrest." Id.; see also United States v. Taylor, 162 F.3d 12, 16 (1st Cir. 1998). In subsequent cases, the Supreme Court has held that the police's investigatory powers include stopping motor vehicles upon reasonable suspicion. Taylor, 162 F.3d at 17.

The initial stop in this case was based upon information derived from a court-authorized wiretap which disclosed that C. Delgado was using the Nissan Quest to transport cocaine from Almonte to Merced. The information was sufficient to justify the initial stop. Thereafter, the actions of Officers Kalish and Howard were "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. The dog sniff that alerted the officers to the presence of narcotics did not constitute a search and, under the circumstances, was eminently reasonable. See United States v. Place, 462 U.S. 696, 707 (1983); City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) (no search when dog sniffed exterior of cars stopped at city drug interdiction checkpoints); United States v. Esquilin, 208 F.3d 315, 318 (1st Cir. 2000)(no search when dog sniffed interior of hotel room after defendant consented to presence of dog and officers in room); United States v. Burton, 288 F.3d 91, 100 n.6 (3d Cir. 2002)(no search when

"walking a dog around the outside of the vehicle"). Moreover, once the dog indicated that narcotics were present, the officers properly examined the area at issue. At this point, even without the information obtained from the wiretaps, Officer Kalish had probable cause to search for and seize the evidence in question. Moreover, the subsequent seizure of the vehicle was similarly justified as it was not practical to take apart the car door on a public street. Finally, although the officers had sufficient probable cause to conduct a warrantless search, they choose to obtain a search warrant thereby eliminating any possible Fourth Amendment issues.[7]

### D. There Was Probable Cause To Search the Nissan Quest Even Without The State Search Warrant.

As noted above, the search of the Nissan Quest was ultimately conducted pursuant to a state search warrant. But even if this Court were to determine that the warrant was invalid or, as the defendants contend, that the initial investigatory stop of the vehicle exceeded the parameters set forth by the Supreme Court in <u>Terry v. Ohio</u>, the search of the vehicle still was justified because the police had probable cause to believe

---

[7] In his memorandum of law submitted in support of his motion to suppress, Almonte states that he has not yet reviewed the state search warrant. The government has now provided Almonte and C. Delgado with a copy of the search warrant and supporting affidavit prepared by Officer Kalish. In any event, because the officers had ample probable cause to search the vehicle before the warrant was obtained, there is no need to address the sufficiency of the warrant itself.

40