that the vehicle contained cocaine.

With respect to a warrantless search of a motor vehicle, the First Circuit has frequently held that authorities may conduct a warrantless search of a motor vehicle as long as they have "probable cause to believe that the vehicle contains contraband or other evidence of criminal activity." United States v. Staula, 80 F.3d 596, 602 (1st Cir. 1996); see also United States v. Martinez-Molina, 64 F.3d 719, 730 (1st Cir. 1995). "As in other contexts, probable cause to search a vehicle exists where the facts and circumstances known to the arresting officers are sufficient to cause a person of reasonable caution to believe the search is justified." Martinez-Molina, 64 F.3d at 730 (citations omitted). That is, "there must have been particular facts indicating that, at the time of search, the vehicle or a container within it carried contraband, evidence of crime, or other seizable matter." Id. Probable cause is a "fluid concept" that "'turn[s] on the assessment of probabilities in particular factual contexts,'" Id. at 726 (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). It "must be evaluated in light of the totality of the circumstances." Id. (citations omitted); Staula, 80 F.3d at 602.

Applying these standards, it is clear that the DEA agents and Springfield police officers had probable cause to believe that the Nissan Quest was carrying contraband or evidence of

41

criminal activity. By the late afternoon of February 4, 2003, the DEA agents had a host of specific and "particular facts," Martinez-Molina, 64 F.3d at 730, gleaned from direct observation and intercepted conversations, to suggest that the Quest was being used in an illegal drug trafficking operation.

Similarly unavailing is C. Delgado's argument that the stop and subsequent search of the vehicle was unconstitutional because there is no evidence that Officer Kalish was aware of all the facts and circumstances surrounding the investigation. First, contrary to C. Delgado's assertion, Officer Kalish was acting at the direction of the DEA agents and Springfield police officer Shink who, at the time, was assigned to the Merced/Almonte investigation. Moreover, even if Officer Kalish was unfamiliar with the extent of the investigation, he was unquestionably "cooperating in [the] investigation" and therefore, the DEA's information concerning C. Delgado's delivery of cocaine to Merced can be imputed to Officer Kalish. Taylor, 162 F.3d at 17 n. 2 (quoting United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997)).

III. **ALMONTE'S AND C. DELGADO'S MOTIONS FOR SEVERANCE AND RELIEF FROM PREJUDICIAL JOINDER SHOULD BE DENIED.**

Almonte and C. Delgado each claim that the indictment which charges them both with conspiracy to possess with itent to distribute narcotics violates Fed. R. Crim. P. 8(b) because the offenses "do not arise out of the same act, transaction or common

42

scheme or plan." This argument wholly ignores the facts and circumstances of the instant case and should be rejected out of hand.

Rule 8(b) permits multiple defendants to be joined in a single indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. "Normally, the government may join multiple defendants in a single indictment provided that at least one count alleges a conspiracy or a continuing criminal enterprise and the indictment separately alleges that the appellant committed a substantive offense during the course and in furtherance of the 'umbrella' conspiracy or CCE." United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998); see also United States v. Rehal, 940 F.2d 1, 3 (1st Cir. 1991) (noting that "[a] conspiracy count can be a sufficient connecting link between . . . multiple offenses that tips the balance in favor of joinder"). Here, Almonte and C. Delgado are charged with conspiracy in Count One and with a substantive drug possession charge in Count Eight. Under the circumstances, joinder is proper.

The defendants next argue that their cases should be severed from the others under Fed.R.Crim.P. 14 because a joint trial will result in undue prejudice. This claim also fails. "The . . . federal courts have long recognized that consolidated trials tend

43

to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants." United States v. Josleyn, 99 F.3d 1182, 1188 (1st Cir. 1996). Thus Almonte and C. Delgado are required to make a "strong showing of prejudice." United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir. 1992). Other than baldly alleging prejudice and that "Bruton" problems may materialize, neither Almonte nor C. Delgado have demonstrated how they will be prejudiced by a joint trial. As noted by the Court in DeLuca, first, "a measure of evidentiary spillover is a foreseeable concomitant of virtually every joint trial, yet seldom indicates undue prejudice." 137 F.3d at 36; United States v. Yefsky, 994 F.2d 885, 896 (1st Cir. 1993). Second, since any evidentiary spillover is vitiated where the evidence in all events would have been admissible against the movant, "[i]n the context of conspiracy, severance will rarely, if ever, be required." United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995)(internal quotations marks and citations omitted); see also Fed.R.Evid. 801(d)(2)(defining, as admissible non-hearsay, statements by defendant's co-conspirator during the course and in furtherance of conspiracy). So it is here.

Finally, this Court will be able to take precautions against prejudicial spillover by instructing the jury that it must consider the evidence against each individual defendant in

44

relation to each count. See United States v. Natanel, 938 F.2d 302, 306 (1st Cir. 1991)(noting that such instructions mitigate risk of spillover).

### IV. C. DELGADO'S MOTION TO SUPPRESS ORAL STATEMENTS SIMILARLY SHOULD BE DENIED.

On March 3, 2003, C. Delgado was processed at the U.S. Marshal's Office prior to appearing before Magistrate Judge Neiman for his arraignment. DEA Special Agents Wales and Olsen were present for the purpose of obtaining fingerprints and basic biographical information in order to complete the standard DEA booking form. C. Delgado was in custody at the time, but he was not, as he now argues, being interrogated. On the contrary, SA Wales described the nature of the charges and then told C. Delgado that he should inform his attorney if he wanted to discuss the case or cooperate with the investigation.

C. Delgado responded by stating that "they" paid for his attorney and, if he cooperated, his attorney would tell "them" so. C. Delgado then stated that if the agents could get him "out on the streets" he could do big things. SA Wales then instructed C. Delgado to speak with his attorney a second time.

C. Delgado contends that the statements described above were obtained in violation of Miranda and should be excluded from evidence at trial. The government disagrees.

First, although C. Delgado was in custody, he was not subject to interrogation. In Rhode Island v. Innis, 446 U.S.

45

291, 300-01 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." The functional equivalent of interrogation consists of "words or actions on the part of the police. . . that the police should know are reasonably likely to illicit an incriminating response from the suspect." Id. at 301. There is little question here that SA Wales did no more than tell C. Delgado that he should speak to his attorney if he wanted to cooperate. Hardly can this statement on the part of SA Wales be classified as conduct "likely to elicit an incriminating response." Id.; cf. United States v. Ortiz, 177 F.3d 108, 109-10 (1st Cir. 1999) (functional equivalent of interrogation when police <u>reinitiated</u> questioning by asking if defendant wanted to cooperate <u>after</u> defendant asked for counsel).

V. **THE SEARCH OF ALMONTE'S RESIDENCE AND HIS RESTAURANT, EL VALLE, WERE PROPER BECAUSE THE EVIDENCE WAS NOT STALE, AS HE CLAIMS, AND THE "KNOCK AND ANNOUNCE" REQUIREMENT WAS MET.**

On February 13, 2003, at approximately 6:00 in the morning, law enforcement agents executed a federal search warrant issued by Senior Judge Frank Freedman at Almonte's primary residence, 116 Wilmont Street, in Springfield. Among other items, the agents seized eight cellular telephones, approximately $2,188 in United States currency, and various documents.

Approximately one hour later, at 7:00 a.m., another group of law enforcement agents executed a federal search warrant also

46

issued by Senior Frank Freedman at Almonte's restaurant, El Valle, located at 901 Carew Street in Springfield. During the course of that search, various records and documents were seized. Both warrants were supported by an affidavit prepared by SA Wales.

Almonte has moved to suppress all evidence seized from his residence and his restaurant on the grounds that (1) the information set forth in SA Wales' affidavit was stale; and (2) no evidence was produced that demonstrates that the police complied with the "knock and announce requirements" when they executed the warrants. Almonte's latter argument will be easily disposed of at an evidentiary hearing, if one is held, as the "knock and announce" rule was fully met at both locations.

Almonte's argument regarding the sufficiency of the affidavit is similarly without merit. The totality of the circumstances stated in the affidavit demonstrated probable cause to search Almonte's house and place of business for documents, cash and drug-related items. Furthermore, even if the affidavit did not establish probable cause, the searches are valid under the good faith exception set forth in United States v. Leon, 468 U.S. 897 (1984).

In determining whether an affidavit establishes probable cause to search a particular place, a court must "make a practical, common-sense decision whether, given all the

47

circumstances set forth in the affidavit[,]. . . there is a fair probability that contraband or evidence of a crime will be found in [that] particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997). Although Almonte appears to acknowledge that the affidavit established probable cause that he sold drugs and that he lived at 116 Wilmont Street and worked at El Valle, he contends that the information linking his drug activity to these two places was stale, and therefore, at the time of the searches were executed on February 13, 2004, any probable cause that had previously existed had evaporated.

Almonte's argument belies commonsense. SA Wales' affidavit (attached hereto as Exhibit C) presented sufficient facts from which Senior Judge Freedman could draw the reasonable inference that incriminating evidence would likely be found at Almonte's house and restaurant. See United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999). As this Court has stated, "the criterion . . . is whether the facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found." Id. at 87, (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard." Gates, 462 U.S. at 235 (citation omitted).

Here, the affidavit provided detailed information derived

48

Case 3:04-cr-30026-MAP    Document 25-3    Filed 09/06/2005    Page 9 of 18

from two court authorized wiretaps that showed Almonte was a principle member of a large, multi-district narcotics distribution scheme. The affidavit also connected Almonte's drug-activity to his residence and restaurant. As Almonte acknowledges, this connection was based in part on conversations that were intercepted on January 22 and 26, 2003. However, the connection was also based upon SA Wales' opinion that drug dealers keep documents and other items related to their drug dealing at their homes and/or places of business. (Wales Search Aff. ¶¶ 65-71). SA Wales' affidavit unequivocally established that Almonte was a large-scale, long-time drug dealer, and therefore it was reasonable to infer that a regular drug trafficker like Almonte maintained documents showing customers' and suppliers' names and telephone numbers, and related accounting information, such as monies paid and collected in a "safe accessible place." See Feliz, 182 F.3d at 87, 88.

Even if this Court finds that the search warrants were not supported by probable cause to believe that the items sought would be found in Almonte's residence and restaurant, the search is valid under the good faith exception to the exclusionary rule. Where there is no probable cause for issuance of a search warrant, the evidence seized during the execution of that warrant must be excluded from the case against the defendant. United States v. Beckett, 321 F.3d 26, 31 (1st Cir. 2003). In Leon,

49

however, the Supreme Court carved out an exception to the exclusionary rule, holding that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." 468 U.S. at 922; see id. at 926 (suppression not appropriate remedy where defective warrant based upon "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause"). Suppression in such cases does not "'logically contribute to the deterrence of Fourth Amendment violations.'" United States v. Capozzi, 347 F.3d 237, 332 (1st Cir. 2003)(quoting Leon, 468 U.S. at 921); United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).

IV. **C. DELGADO'S REQUEST FOR A DAUBERT HEARING CONCERNING THE "OPINION" OF A SNIFF DOG IS PREMATURE, AT BEST, AND THEREFORE SHOULD BE DENIED AT THIS JUNCTURE.**

C. Delgado has also moved to exclude any evidence concerning "the opinion of sniff dog" on the ground that such evidence is unreliable. At this juncture, the government does not intend to offer any "opinion" evidence relating to the dog sniff. At best, the government anticipates that evidence of the dog's presence at the scene of the stop will be introduced at trial only to explain the sequence of events. Because it is unlikely that this issue will arise at trial, the government does not believe that a Daubert hearing is warranted.

50

VII. **WINSTON'S MOTION TO SUPPRESS PHYSICAL EVIDENCE SEIZED FROM HIS RESIDENCE PURSUANT TO A SEARCH WARRANT AND TO SUPPRESS ORAL STATEMENTS MADE TO LAW ENFORCEMENT AGENTS DURING HIS ARREST SHOULD BE DENIED.**

On October 14, 2003, a federal grand jury returned a superseding indictment in the Merced case which charged seven additional co-conspirators, including Winston, with conspiracy to possess with intent to distribute narcotics. An arrest warrant, issued by Magistrate Judge Neiman was executed by federal and local agents on October 15, 2003.

Winston was arrested the following day at his home located at 110A Carr Street in Springfield. During the course of executing the arrest warrant, law enforcement agents made two observations that subsequently formed the basis, in part, for obtaining a search warrant. First, while conducting a protective sweep of the house, law enforcement agents found a safe in the basement. Winston later acknowledged that the safe was his. Second, the agent observed a large bundle of cash on the top drawer of a night stand that contained Winston's wallet.

Thereafter, as Winston was being escorted from the premises he stated that he "wasn't doing anything anymore" and that he "was in real estate now." This statement, which indicated that Winston was distancing himself from prior criminal activity was also included in the affidavit submitted in support of a search warrant that was executed that same day.

During the course of the search, law enforcement agents

51

seized the following items, among others from the residence:

1. a black - digital scale containing cocaine base residue was seized from the closet of Winston's bedroom;

2. $57,995.00 in U.S. Currency was seized from a safe located in the basement of the residence;

3. $6,629.00 in U.S. Currency was seized from Winston's bedroom;

4. a Master Piece Arms .45 caliber pistol with a loaded magazine was found under the bed in a separate bedroom. Forty rounds of .9mm ammunition were also found in that room; and

5. two rounds of .45 caliber ACP ammunition and ten rounds of .40 caliber ACP ammunition were seized from Winston's bedroom.

### A. The Evidence Should Not Be Suppressed Because the Search Warrant Affidavit Established Probable Cause.

Following Winston's arrest, Magistrate Judge Neiman issued a search warrant for Winston's residence. The warrant was based on the affidavit of DEA SA Wales. The affidavit set forth the information supporting SA Wales' conclusion that he had probable cause to believe that Winston was engaged in criminal activity, i.e. possession and distribution of narcotics and that evidence of the proceeds of that criminal activity, i.e. currency, would probably be found in the residence. The affidavit included a description of Winston's participation in a conspiracy with Merced and others to distribute narcotics and, as noted above, included information obtained during Winston's arrest.

Winston contends that the search warrant affidavit failed to establish probable cause because it relied upon illegally

52

obtained evidence. Specifically, Winston claims that law enforcement officers conducted an illegal search rather than a lawful protective sweep when they entered the basement where they observed the safe. Winston also claims that the agents improperly requested identification from him which lead, in turn, to an illegal search of his night stand where the agents observed a large amount of cash. According to Winston, once these two observations are removed from the probable cause calculation, the affidavit is insufficient. Winston's argument fails for the following reasons.

First, as Winston acknowledges, "the Constitution permits police officers, entering a house with an arrest warrant, to conduct a protective sweep of the house provided that the officers possess a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." United States v. Daoust, 916 F.2d 757, 759 (1st Cir. 1990)(quoting Maryland v. Buie, 494 U.S. 325 (1990)). At an evidentiary hearing the government will show that the protective sweep was justified. The law enforcement agents executing the arrest warrant knew that Winston had a prior criminal history and had been arrested just one month earlier for possession of a loaded firearm. In addition, when the agents first knocked on Winston's door, Winston's girlfriend, Elizabeth Ortiz, attempted to deceive the

officers by falsely stating that she did not recognize Winston's BMW that was parked just outside the house. As a result, the agents knocked on the door of the adjoining apartment and waited for a few minutes before returning to Winston's door. The officers could reasonably conclude that an individual posing a danger would have been alerted to their presence by Ms. Ortiz and had time to conceal themselves. Finally, the evidence will show that the sweep was limited in scope and duration. See e.g. Maryland v. Buie, 494 U.S. at 335-336. In short, because the safe was observed during a properly limited sweep, the Magistrate Judge was entitled to rely on the presence of the safe in determining whether there was probable cause to search the residence.

Similarly, the agents' observation of cash in Winston's night stand was properly considered as a factor tending to establish probable cause that additional proceeds of Winston's drug activity would be found at his residence. The agent's asked him for identification. Winston contends that this information is tainted because the observation was made by the agents after they asked Winston for some identification but before he was given his Miranda warnings. However, the agents' inquiry for identification does not constitute interrogation and therefore Miranda warnings were not required. The inquiry for Winston's identification is analogous to the type of information obtained

54

during a routine booking where no Miranda warnings are required. See e.g. United States v. Reyes, 225 F.3d 71, 76-77 (1st Cir. 2000)(agent's request to defendant for names, date of birth, and social security number squarely within routine booking exception).

Finally, even if this Court were to find that the affidavit lacked probable cause, the good faith exception set forth in Leon applies here. In Leon, the Court recognized that the purpose of the exclusionary rule is to deter misconduct, and thus declined to apply the rule where an officer acts in good faith to obtain a warrant, because suppression in such cases does not "logically contribute to the deterrence of Fourth Amendment violations." 468 U.S. at 905-926; Capozzi, 347 F.3d at 332.

That reasoning is all the more compelling here, where rather than seize the money and safe under the plain view doctrine, the agents prudently secured the residence and sought a search warrant. This is precisely the type of conduct that the Court should promote rather than punish.

B. **Winston's Oral Statements Were Not Improperly Obtained in Violation of Miranda and, Therefore, Should Not Be Suppressed.**

Winston has moved to suppress three oral statements he made to law enforcement agents. First, just after placing Winston in handcuffs, SA Wales asked Winston if he had any drugs or guns in the house. Winston responded by stating that all he had was "a

55

lot of money." As Winston correctly notes, he had not yet been advised of his Miranda rights when the question was posed. Although Winston was in custody at the time, the question was not improper under the circumstances. On the contrary, the question posed by SA Wales falls squarely within the "public safety" exception to the Miranda rule. <u>New York v. Quarles</u>, 467 U.S. 649 (1984). Where, as here, the agents found an unattended 14 month old child within feet of Winston and the area within Winston's control, it was entirely reasonable for them to be concerned about safety issues, particularly given their awareness of Winston's firearms-related history. Also, at that point, the residence had not yet been secured, a circumstance which increased the agent's concern for themselves, the child and other residents of the house. In sum, as the Supreme Court noted in <u>Quarles</u>, there are some situations where the need for answers to questions regarding public safety outweighs the need for the prophylatic Miranda warnings. 467 U.S. at 657. This is one of those situations. Accordingly, the motion to suppress Winston's statement regarding the money in the house should be denied.

Next, Winston claims that the Court should suppress two statements he made to law enforcement officers as he was leaving his residence. After Winston was arrested and his identification was procured, he was brought outside by SA Wales. At that point another agent, who had conducted a sweep of the basement,

56

informed SA Wales that he found a safe. Winston then stated that the safe was his. The statement was not prompted by any question and was entirely spontaneous. Accordingly, there is no basis for suppressing it.

Winston's statement to law enforcement agents that he "wasn't doing anything anymore" and was in "real estate now" was also made without any prompting on the part of a law enforcement agents. This statement was made as Winston was escorted to a police vehicle and, again, before he was advised of his right. However, like the remark regarding ownership of the safe, Winston's statement was spontaneous. As a result, it should not be suppressed.

## CONCLUSION

Based on the foregoing, the government respectfully requests that the Court deny the defendants' motions that were addressed herein.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/
Ariane D. Vuono
Thomas J. O'Connor
Assistant U.S. Attorneys

Dated: December 7, 2004

57

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served upon each person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

David J. Wenc, Esq.
44 Main Street
P.O. Box 306
Windsor Locks, CT 06096-0306

Alan J. Black, Esq.
1383 Main Street
Springfield, MA 01103

David P. Hoose, Esq.
Katz, Sasson, Hoose & Turnbull
1145 Main Street
Springfield, MA 01103

This 7th day of December, 2004.

_____
Thomas J. O'Connor, Jr.
ASSISTANT UNITED STATES ATTORNEY